# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 6, 2017          Decided June 20, 2017

No. 16-7042

DAVID L. DE CSEPEL, ET AL.,
APPELLEES

v.

REPUBLIC OF HUNGARY, A FOREIGN STATE, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01261)

*Thaddeus J. Stauber* argued the cause for appellants. With him on the briefs were *Emily Crandall Harlan* and *Sarah Erickson André*.

*Alycia Regan Benenati* argued the cause for appellees. With her on the brief were *Sheron Korpus*, *Michael Shuster*, *Michael D. Hays*, and *Alyssa T. Saunders*.

Before: HENDERSON and TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting from part II.B.2 filed by *Senior Circuit Judge* RANDOLPH.

TATEL, *Circuit Judge*: For the second time, we consider a family's decades-long effort to recover a valuable art collection that the World-War-II–era Hungarian government and its Nazi collaborators seized during their wholesale plunder of Jewish property during the Holocaust. On remand from our earlier decision, the district court concluded that the family's claims against the Republic of Hungary, its museums, and a state university satisfy the expropriation exception to the Foreign Sovereign Immunities Act and that no other provision of the Act bars their claims. For the reasons explained below, we affirm in part, reverse in part, and along the way, resolve several issues regarding the Act's application to claims seeking to recover art stolen during the Holocaust.

## I.

We described the background of this case in our earlier opinion, *de Csepel v. Republic of Hungary*, 714 F.3d 591, 594–97 (D.C. Cir. 2013). For the reader's convenience, we repeat it virtually in full.

Baron Mór Lipót Herzog was a "passionate Jewish art collector in pre-war Hungary" who assembled a collection of more than two thousand paintings, sculptures, and other artworks. Compl. ¶ 38. Known as the "Herzog Collection," this body of artwork was "one of Europe's great private collections of art, and the largest in Hungary," and included works by renowned artists such as El Greco, Diego Velázquez, Pierre–Auguste Renoir, and Claude Monet. *Id.* Following Herzog's death in 1934 and his wife's shortly thereafter, their daughter Erzsébet and two sons István and András inherited the Collection. *Id.* ¶ 39.

Then came World War II, and Hungary joined the Axis Powers. In March 1944, Adolf Hitler sent German troops into Hungary, and SS Commander Adolf Eichmann entered the country along with the occupying forces and established headquarters at the Majestic Hotel in Budapest. *Id*. ¶¶ 51, 60. During this time, Hungarian Jews were subjected to anti-Semitic laws restricting their economic and cultural participation in Hungarian society and deported to German concentration camps. *Id*. ¶¶ 44, 47, 52. As an integral part of its oppression of Hungarian Jews, "[t]he Hungarian government, including the Hungarian state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone 'of Jewish origin' of their assets." *Id*. ¶ 54. Jews "were required to register all of their property and valuables" in excess of a certain value, and the Hungarian government "inventoried the contents of safes and confiscated cash, jewelry, and other valuables belonging to Jews." *Id*. ¶ 55. "[P]articularly concerned with the retention of artistic treasures belonging to Jews," the Hungarian government established "a so-called Commission for the Recording and Safeguarding of Impounded Art Objects of Jews . . . and required Hungarian Jews promptly to register all art objects in their possession." *Id*. ¶ 56. "These art treasures were sequestered and collected centrally by the Commission for Art Objects," headed by the director of the Hungarian Museum of Fine Arts. *Id.*

In response to widespread looting of Jewish property, the Herzogs "attempted to save their art works from damage and confiscation by hiding the bulk of [them] in the cellar of one of the family's factories at Budafok." *Id*. ¶ 58. Despite these efforts, "the Hungarian government and their Nazi[ ] collaborators discovered the hiding place" and confiscated the artworks. *Id*. ¶ 59. They were "taken directly to Adolf Eichmann's headquarters at the Majestic Hotel in Budapest for

his inspection," where he "selected many of the best pieces of the Herzog Collection" for display near Gestapo headquarters and for eventual transport to Germany. *Id*. ¶ 60. "The remainder was handed over by the Hungarian government to the Museum of Fine Arts for safekeeping." *Id*. After seizure of the Collection, a pro-Nazi newspaper ran an article in which the director of the Hungarian Museum of Fine Arts boasted that "[t]he Mór Herzog collection contains treasures the artistic value of which exceeds that of any similar collection in the country. . . . If the state now takes over these treasures, the Museum of Fine Arts will become a collection ranking just behind Madrid." *Id*. ¶ 59.

"Fearing for their lives, and stripped of their property and livelihoods, the Herzog family was forced to flee Hungary or face extermination." *Id*. ¶ 63. Erzsébet Herzog (Erzsébet Weiss de Csepel following her marriage) fled Hungary with her children, first reaching Portugal and eventually settling in the United States, where she became a U.S. citizen in 1952. *Id*. István Herzog was nearly sent to Auschwitz but "escaped after his former sister-in-law's husband . . . arranged for him to be put in a safe house under the protection of the Spanish Embassy." *Id*. ¶ 42. Several members of his family escaped to Switzerland while others remained in Hungary. *Id*. ¶ 64. István Herzog died in 1966, leaving his estate to his two sons, Stephan and Péter Herzog, and his second wife, Mária Bertalanffy. *Id*. ¶ 42. András Herzog was "sent . . . into forced labor in 1942 and he died on the Eastern Front in 1943." *Id*. ¶ 41. His daughters, Julia Alice Herzog and Angela Maria Herzog, fled to Argentina and eventually settled in Italy. *Id*. ¶ 64.

In our prior opinion, we described the family's seven-decade effort to reclaim the Collection, including through Hungarian courts. *de Csepel*, 714 F.3d at 595–96; *see de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113, 134–35 (D.D.C.

2011). When those efforts proved unsuccessful, the Herzog family filed suit in U.S. district court against the Republic of Hungary, three art museums—the Budapest Museum of Fine Arts, the Hungarian National Gallery, and the Museum of Applied Arts—and the Budapest University of Technology and Economics (collectively, "Hungary"). The family alleges that Hungary's taking of forty-four pieces of the Herzog Collection "constituted an express or implied-in-fact bailment contract," and that its failure to return them upon demand breached the bailment contract and constituted conversion and unjust enrichment. Compl. ¶¶ 96–110. The family seeks imposition of a constructive trust, an accounting, and a declaration of its ownership of the Herzog collection, all aimed at either recovering the artwork or obtaining over $100 million in compensation. *Id.* ¶¶ 111–28 & pt. V.

Hungary moved to dismiss, arguing that the suit was barred by the Foreign Sovereign Immunities Act (FSIA). That Act authorizes federal jurisdiction over civil actions against foreign states, as relevant here, only in certain cases involving expropriated property or commercial activity, and only to the extent such jurisdiction is not inconsistent with certain international agreements. 28 U.S.C. §§ 1604–05. The district court denied Hungary's motion, concluding that the expropriation exception applies to the Herzog family's claims and that jurisdiction is not inconsistent with agreements between the United States and Hungary. *de Csepel*, 808 F. Supp. 2d. at 128–35. Hungary appealed, and "without ruling on the availability of the expropriation exception," we concluded that the family's claims satisfied the Act's commercial activity exception. *de Csepel*, 714 F.3d at 597–603.

Back in the district court, and following the close of discovery, Hungary renewed its motion to dismiss. The district court agreed with Hungary that the freshly developed record

failed to show that the commercial activities, *i.e.*, the bailment agreements, had any "direct effect" in the United States, as required by the commercial activity exception. *de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 158–63 (D.D.C. 2016) (quoting 28 U.S.C. § 1605(a)(2)). It nonetheless again concluded that the expropriation exception applies, and that no treaty forecloses its application. *Id.* at 163–69. The court therefore denied the motion to dismiss, except as to two paintings—Lucian Cranach the Elder's "The Annunciation to Saint Joachim" and John Opie's "Portrait of a Lady"—that Hungary acquired from third parties after the war. *Id.* at 165–67.

Hungary now appeals, seeking dismissal of the claims regarding the remaining forty-two pieces. It argues that all claims are barred by a 1947 treaty between Hungary and the Allied Powers and, alternatively, that the expropriation exception is inapplicable. For its part, the Herzog family defends the district court's decision, but asks that, should we dismiss any of their claims, they be given leave to amend their complaint in light of the Holocaust Expropriated Art Recovery Act of 2016, Pub. L. 114–308, 130 Stat. 1524, which Congress enacted during the pendency of this appeal to remove "significant procedural obstacles" facing "[v]ictims of Nazi persecution" seeking to "recover Nazi-confiscated art." *Id.* § 2(6). We have jurisdiction under the collateral order doctrine, *see Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004) (holding that "denial of a motion to dismiss on the ground of sovereign immunity" is subject to interlocutory review under the collateral order doctrine), and our review is de novo, *de Csepel*, 714 F.3d at 597.

Before considering the parties' arguments, we think it helpful to explain that the issues before us relate to two distinct

groups of art. The first—some twenty-five pieces—was never physically returned to the family. As the district court explained, after being seized, they were "scattered across Nazi-occupied Europe," and then "shipped back" to Hungary after the war. *de Csepel*, 169 F. Supp. 3d at 149. According to the family, these paintings are "being held by Hungary in a custodial role" under a bailment arrangement. *Id.* at 149–51, 160. The second category—some fifteen pieces—was returned to the family after the war, but Hungary later regained custody through various procedures not relevant to the issues before us. *See id.* at 149–51.

## II.

The Foreign Sovereign Immunities Act provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," subject to certain exceptions. 28 U.S.C. § 1604. When a "defendant foreign state has asserted the jurisdictional defense of immunity, the defendant state bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Belize Social Development Ltd. v. Government of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015) (citation and internal quotation marks omitted).

Two FSIA provisions are central to this appeal: the treaty exception, which Hungary contends bars all of the family's claims; and the expropriation exception, which the family, echoing the district court, argues vitiates Hungary's sovereign immunity. We consider each in turn.

## A.

Under the FSIA, a foreign sovereign's immunity is "[s]ubject to existing international agreements to which the United States [wa]s a party at the time of enactment of th[e]

Act." 28 U.S.C. § 1604. Pursuant to that exception, "if there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails." *de Csepel*, 714 F.3d at 601 (alteration, citation, and internal quotation marks omitted). As our court recently explained in *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016), which also involved the Hungarian government's wartime seizure of Jewish property—in that case, the personal property of Jews sent to death camps—where "a pre-existing treaty is said to confer *more* immunity than would the FSIA, the treaty exception would override any of the FSIA's exceptions to immunity under which the claims otherwise could go forward." *Id.* at 135–36.

Hungary argues that the 1947 Treaty of Peace, Feb. 10, 1947, 61 Stat. 2065, 41 U.N.T.S. 135, which settled questions outstanding between the Allied Powers and Hungary, including claims of Hungarian nationals for property seized during the war, is just such a treaty. Under Article 27 of the treaty, Hungary promised to restore the property of all "persons under Hungarian jurisdiction" who were "the subject of measures of sequestration, confiscation or control on account of the racial origin or religion of such persons." *Id.* art. 27. Article 40 established a mechanism for resolving "any dispute concerning the . . . execution of the Treaty," *i.e.*, direct diplomatic negotiations followed by referral to the "Heads of the Diplomatic Missions in Budapest of the Soviet Union, the United Kingdom and the United States of America, acting in concert." *Id.* arts. 39–40. According to Hungary, these provisions created an exclusive mechanism for individuals seeking restitution of property expropriated by Hungary during World War II, thereby barring additional liability through an FSIA exception.

As the district court correctly noted, however, Hungary's argument is completely foreclosed by *Simon*, which holds that "while Article 27 secures one mechanism by which Hungarian victims may seek recovery, it does not establish the *exclusive* means of doing so." 812 F.3d at 137; *see de Csepel*, 169 F. Supp. 3d at 164–65. "The terms of Article 27," *Simon* explains, "do not speak in the language of exclusivity," and although "[a] sovereign generally has the authority to espouse and settle the claims of its nationals against foreign countries[,] . . . it has no authority to espouse and extinguish the claims of *another state's* nationals." *Simon*, 812 F.3d at 137–38 (citation and internal quotation marks omitted). In executing the 1947 Treaty, then, "the United States and the other Allied Powers . . . lacked the power to eliminate (or waive) the claims of another state's—*i.e.*, Hungary's—nationals in the treaty's terms." *Id.* at 138.

Hungary argues that the *Simon* court failed to consider the Treaty's introduction, which states that the treaty "will settle questions still outstanding as a result of" the war. 41 U.N.T.S. 135, intro. According to Hungary, the family's claims are barred because they were "affirmatively 'settled'" by the treaty. Appellants' Br. at 35. But this ignores *Simon*'s holding that the Allies had "no power to settle or waive the extra-treaty claims of . . . [Hungary's] nationals." 812 F.3d at 138.

Hungary insists that some of the family's claims are factually distinct from those in *Simon*. According to Hungary, *Simon* addresses only claims filed in lieu of attempts to recover through the treaty. In this case, by contrast, at least some of the claims concern art recovered through the treaty process and later retaken by Hungary. As the Herzog family observes, this is a "distinction without a difference." Appellee's Br. at 52. Because the Herzog family believes that Hungary failed to give them full relief through the treaty, *Simon* allows them to

proceed either through the treaty or through other means like "an Allied nation's courts." *Simon*, 812 F.3d at 138. Hungary points to nothing in the treaty, nor to any principle of international law, suggesting that claimants who attempt to use the treaty but find the relief inadequate are either barred or estopped from bringing extra-treaty claims. Indeed, Hungary's view of the treaty makes little sense: as *Simon* explains, such a reading would require Hungarian nationals to enforce the treaty through Article 40, a state-to-state process, despite having "no obvious nation to speak and negotiate on their behalf against Hungary." *Id.* at 139.

**B.**

The rather abstruse text of the FSIA's expropriation exception is as follows:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States . . . in any case . . . [1] in which rights in property taken in violation of international law are in issue and [2][a] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [b] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). In other words, the exception has two requirements. A claim satisfies the exception if (1) "rights in property taken in violation of international law are in issue," and (2) there is an adequate commercial nexus between the United States and the defendants. *See Agudas Chasidei Chabad*

*of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008). We start with the "rights in property" requirement.

**1.**

Hungary argues that this case involves a bailment agreement, not "rights in property taken in violation of international law." Once again, however, *Simon* controls. That decision holds that Hungary's seizures of Jewish property during the Holocaust constituted genocide and were therefore takings in violation of international law. 812 F.3d at 142–46. Equally important, *Simon* explains that a complaint need not allege a straightforward claim for taking in violation of international law. *See id.* at 140–42; *cf. Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela*, 971 F. Supp. 2d 49, 56 (D.D.C. 2013) ("The Complaint states [a] count[ for] Taking in Violation of International Law."). Rather, "garden-variety common-law causes of action" can suffice. *Simon*, 812 F.3d at 141; *see Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.*, 137 S. Ct. 1312, 1323–24 (2017) (recognizing expropriation exception cases involving "simple common-law claim[s]").

This case is just like *Simon*. Here, as there, Hungary seized Jewish property during the Holocaust. Here, as there, plaintiffs bring "garden-variety common-law" claims to recover for that taking. In *Simon*, the plaintiffs' conversion claim alleged that they "had the right to possess personal property that was taken from them by defendants," and their unjust enrichment claim alleged that they "were deprived of their personal property by the defendants and that it would be inequitable and unconscionable for the defendants to continue to enjoy the benefits of possession and use of the plaintiffs' personal property." *Simon*, 812 F.3d at 142 (alteration, citations, and internal quotation marks omitted). So too here. The Herzog family alleges that they "own and have a right to possession of

the Herzog Collection," and that Hungary "reject[ed]" a demand for its return. Compl. ¶¶ 103–05. To be sure, the *Simon* plaintiffs did not bring a bailment claim, but like the conversion claim they did bring bailment is a "garden-variety common-law" claim concerning the right to possess property. *See* George W. Paton, BAILMENT IN THE COMMON LAW 4 (1952) ("This work is primarily concerned with the common law conception of bailment.").

Hungary points out that the complaint's "causes of action make *no reference* to a war-time taking." Appellants' Br. at 22. Rather, it says, Hungary's Holocaust expropriations are "legally, factually, and temporally distinct from [plaintiffs'] claims of post-war, non-sovereign, private party commercial bailment breaches." Appellants' Reply Br. at 4.

We agree that there must be some connection between the family's claims and Hungary's expropriation of the Herzog collection. The Herzog family conceded as much at oral argument. *See* Oral Arg. Tr. 20:1–:12 (acknowledging that property once expropriated is not forever tainted by that expropriation). But as the family also emphasizes, most of its claims do in fact involve a tight legal, factual, and temporal connection to Hungary's expropriation of the collection. The district court found, and Hungary concedes, that some twenty-five pieces of art were never returned to the family. *See de Csepel*, 169 F. Supp. 3d at 149; Appellants' Br. at 45. Even though the complaint seeks recovery through a bailment, the fundamental fact remains: Hungary's possession of the Herzog collection stems directly from its expropriation of the collection during the Holocaust. *See Bernstein v. Noble*, 487 A.2d 231, 234 (D.C. 1985) (explaining that one element of a bailment relationship is that "possession and control over an object pass from the bailor to the bailee" (citation and internal quotation marks omitted)).

Hungary argues that the expropriation exception is inapplicable because a bailment claim is, at its core, commercial, and commercial claims may proceed only under the commercial activity exception, not the expropriation exception. Moreover, as Hungary points out, we explained in our earlier decision that the Herzog family "seeks to recover not for the original expropriation of the Collection, but rather for the subsequent breaches of bailment agreements they say they entered into with Hungary." *de Csepel*, 714 F.3d at 598. But we also expressly reserved decision on the availability of the expropriation exception, and we have never held that in order to proceed against a foreign government, a claim must fall into just one FSIA exception—in this case, either the expropriation exception or the commercial activity exception, but not both. Whether an activity is commercial and whether the claim is "based upon" such activity, as the commercial activity exception requires, are altogether different questions from whether the claim places "in issue" an expropriated property right, as the expropriation exception requires. *See* 28 U.S.C. § 1605(a)(2) (depriving a foreign state of immunity when "the action is based upon a commercial activity carried on in the United States by the foreign state"); *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015) ("[A]n action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit."). Indeed, *Simon* explains that garden-variety common-law claims, including a quasi-contractual claim for unjust enrichment, may satisfy the expropriation exception. *Simon*, 812 F.3d at 142; *see id.* at 146 ("There is no reason to assume that, in every discrete context in which [the FSIA] exceptions might be applied . . . , there would be perfect coherence in outcome across all of the exceptions."). The same is true for the family's bailment claim.

Hungary cites a series of cases in which courts have rejected efforts to recast tort and takings claims as commercial

claims in order to satisfy the commercial activity exception. *See, e.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 361–63 (1993) (concluding that plaintiffs could not sue for intentional torts committed by the Saudi police through a commercial claim for "failure to warn" of their "own tortious propensity"); *Rong v. Liaoning Province Government*, 452 F.3d 883, 890 (D.C. Cir. 2006) (holding that the transfer of expropriated property to another government-created entity constituted no commercial activity, because the alternative conclusion would allow jurisdiction over foreign sovereigns based on "almost any subsequent disposition of expropriated property"). Those cases, however, stand only for the proposition that the activity at issue did not constitute "commercial activity" under the FSIA. *Cf. de Csepel*, 714 F.3d at 599 (evaluating whether a bailment agreement is a sovereign act or commercial activity). The question here is very different: whether the claims satisfy the expropriation exception.

We thus conclude that "rights in property taken in violation of international law" are "in issue" as to those twenty-five or so artworks taken by Hungary during the Holocaust and never returned. This, however, does not end our task.

As mentioned above, some fifteen pieces of the Herzog collection were physically returned to family members, and others were "legally released to the family on paper" (though the family "dispute[s] whether they were ever actually returned to their physical custody"). *de Csepel*, 169 F. Supp. 3d at 149. The district court, however, never determined whether the temporary return of the art severed the connection between Hungary's current possession and its Holocaust-era seizure. Instead, it concluded that the return of the art is irrelevant because "the subsequent return of property confiscated by the government does not extinguish the earlier taking; it simply converts a permanent taking to a temporary one, altering the

appropriate measure of damages." *Id.* at 166. But the family's bailment claims do not seek only damages for Hungary's temporary possession of this artwork from World War II until its return. Instead, the family seeks to recover for Hungary's failure to return the art *today* in violation of bailment agreements presumably formed when the country *re*possessed the art. *See* Compl. ¶¶ 100 ("Defendants' possession or re-possession of any portion of the Herzog Collection following WWII constituted an express or implied-in-fact bailment contract for the benefit of the Plaintiffs."); pt. V.A ("On their First Claim of Relief: for an order directing Defendants to return to Plaintiffs the pieces of the Herzog Collection that are now . . . in Defendants' possession . . . or for compensation therefor . . . .").

We shall therefore remand to the district court for it to consider, in the first instance, the Herzog family's claims to those pieces returned by Hungary. *See Simon*, 812 F.3d at 142 ("We leave it to the district court on remand to determine precisely which of the plaintiffs' claims . . . satisfy[] the 'rights in property . . . in issue' requirement of § 1605(a)(3)."). If their return to the family and Hungary's repossession are sufficiently intertwined with the Holocaust-era taking, or if the pieces were retaken in a new violation of international law, the claims may place in issue "rights in property taken in violation of international law." But if Hungary returned the artworks free and clear to the family and then lawfully repossessed them, a claim for their return would not satisfy the expropriation exception.

**2.**

Having concluded that the family's claims for at least some of the artworks satisfy the expropriation exception's first requirement, we turn to the commercial-activity nexus requirement. It contains two clauses: where "rights in property

taken in violation of international law are in issue," then the foreign sovereign loses its immunity if (1) "that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state," or (2) "that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). The district court concluded that the second clause is met here, *see de Csepel*, 169 F. Supp. 3d at 167, and neither the Republic of Hungary nor its various agencies and instrumentalities, *i.e.*, the three museums and the university, dispute that conclusion.

The Republic of Hungary, however, argues that it should nonetheless be dismissed as a defendant. As it points out, unlike the first clause, which refers expressly to the "foreign state," the second clause—the one applicable here—refers to only "an agency or instrumentality of the foreign state." According to the Republic, then, only its "agencies and instrumentalities" are proper defendants, and it should be dismissed. In support, it cites *Simon*, which explains that "[t]he nexus requirement differs somewhat for claims against the foreign state itself (*e.g.*, Hungary) as compared with claims against an agency or instrumentality of the foreign state . . . ." 812 F.3d at 146. "As to the claims against Hungary, the question is whether" the first clause of the nexus requirement is met. *Id.* "As to the claims against [the agency or instrumentality], the question is whether" the second clause is met. *Id.* "Applying that standard," the *Simon* court found that "the plaintiffs' allegations suffice to withstand dismissal as to the claims against the [agency or instrumentality] but not as to the claims against Hungary," and it dismissed the Republic of Hungary from the case. *Id.* at 147–48.

For its part, the Herzog family argues that the second clause must be read in the context of the entire expropriation exception, and read this way, the provision states that "a foreign state shall not be immune . . . in any case . . . in which rights in property taken in violation of international law are in issue" and "that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). In other words, as the family sees it, the foreign state (Hungary) remains a proper defendant as long as its agencies or instrumentalities (the museums and the university) engaged in the requisite commercial activity.

As to *Simon*, the family argues that we are bound not by that decision, but rather by an earlier decision of our court, *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008), a case which also dealt with the exception's second clause. Although the court in that case found that two Russian agencies or instrumentalities "engaged in sufficient commercial activity in the United States to satisfy" that clause, it also "reverse[d]" the district court's "finding of *Russia*'s immunity." *Id.* at 946, 955 (emphasis added). According to the family, because *Chabad* retained the foreign state (Russia) as a defendant, we too must retain the foreign state (Hungary) as a defendant.

The question, then, is whether we are bound by *Chabad* or *Simon*. *See Helmerich & Payne International Drilling Co. v. Bolivarian Republic of Venezuela*, 185 F. Supp. 3d 233, 239–42 (D.D.C. 2016) (recognizing their inconsistency). At first glance, it appears that the family may be correct. *Chabad* retained the foreign state, but *Simon* dismissed it, and in cases of intracircuit conflict we are bound to follow the earlier decision, here *Chabad*. *Sierra Club v. Jackson*, 648 F.3d 848,

854 (D.C. Cir. 2011) ("[W]hen a decision of one panel is inconsistent with the decision of a prior panel, the norm is that the later decision, being in violation of that fixed law, cannot prevail.").

The question, however, is not so simple because "'[b]inding circuit law comes only from the *holdings* of a prior panel.'" *Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017) (emphasis added) (quoting *Gershman v. Group Health Association*, 975 F.2d 886, 897 (D.C. Cir. 1992)). The precise question, then, is whether the *Chabad* court *held* that a foreign state loses immunity if the second nexus requirement is met. We think it did not.

The issue of the Russian state's immunity was completely unaddressed by the district court and neither raised nor briefed on appeal—a deficiency that, as then-Judge Scalia reminded us, deprives the court of the benefits of the adversarial system. *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) ("Failure to enforce" Federal Rule of Appellate Procedure 28, which requires that the parties brief the issues presented, "deprive[s] us in substantial measure of that assistance of counsel which the system assumes—a deficiency that we can perhaps supply by other means, but not without altering the character of our institution."). The court, moreover, did not explain why it kept the Russian Federation in the case. In fact, we only know that it did because at the end of its opinion it stated "we reverse [the district court's] finding of Russia's immunity." *Chabad*, 528 F.3d at 955. As our court recently explained in *United States v. Jones*, 846 F.3d 366 (D.C. Cir. 2017), where "[o]ur prior decisions . . . merely stated without analysis that [jurisdiction] existed, . . . those cursory and unexamined statements of jurisdiction have no precedential effect." *Id.* at 369 (citations and internal quotation marks omitted). In that case, the court considered whether it had

authority to review district court orders granting or denying sentence reductions under 18 U.S.C. § 3582(c)(2). Though we had previously reviewed such orders and stated that we "ha[d] jurisdiction" under two specific statutes, *see United States v. Kennedy*, 722 F.3d 439, 442 (D.C. Cir. 2013) (citing 28 U.S.C. § 1291); *United States v. Cook*, 594 F.3d 883, 885 (D.C. Cir. 2010) (citing 28 U.S.C. § 1291; 18 U.S.C. § 3742(a)(1)), these bare statements, the court explained, were too conclusory to constitute binding precedent. Accordingly, the *Jones* court "grapple[d] with the issue more explicitly" and "f[ound] that 28 U.S.C. § 1291 permits such review." *Id.* at 368–69.

So too here. While readers of the dissent might think that the *Chabad* court discussed at length whether the Russian Federation should remain in the case, the court reversed the district court with no explanation at all. *See Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016) (noting that *Chabad* asserted jurisdiction over Russia "without separate discussion" of the foreign state). Such a "cursory and unexamined" reversal is just the kind of "drive-by jurisdictional ruling[]" that the Supreme Court has explained "ha[s] no precedential effect." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 91 (1998).

Indeed, *Chabad*'s analysis is in tension with its apparent decision to extend jurisdiction from Russia's agencies and instrumentalities to the foreign state itself. Recall that the first clause of the nexus requirement mandates that the property be physically present in the United States, but the second does not. In *Chabad*, the defendants argued that it "would be quite anomalous" if the second clause could be satisfied by both a relaxed physical presence requirement and a lower level of commercial activity. *Chabad*, 528 F.3d at 947. The level of commercial activity necessary to satisfy the second clause, the argument went, must therefore be higher than that necessary to

satisfy the first clause. The *Chabad* court considered that argument at some length before rejecting it. *See id.* at 947; *see also Agudas Chasidei Chabad of U.S. v. Russian Federation*, 466 F. Supp. 2d 6, 24–25 (D.D.C. 2006). But it did so by explaining that the first clause "applies to activities 'carried on *by the foreign state*,' whereas the second clause involves the commercial activities of the foreign state's agencies and instrumentalities." *Chabad*, 528 F.3d at 947. The second clause's lower bar made sense in light of agencies' and instrumentalities' "greater detachment from the state itself." *Id.* Given that the *Chabad* court recognized that the expropriation exception provides greater protection to foreign states than to agencies and instrumentalities, why would it have held that foreign states lose their immunity whenever the lower bar is satisfied? If there is an answer to that question, it appears nowhere in the *Chabad* opinion. Although the *Chabad* court did discuss the commercial-activity nexus requirements, as the dissent notes, Dissenting Op. at 6–8, it never considered the issue before us, namely, whether a foreign state loses its immunity simply because its agency or instrumentality satisfies the expropriation exception's second clause.

By contrast to the *Chabad* court, the *Simon* court expressly considered and decided the question of foreign state immunity under the expropriation exception. It explained that the nexus requirement for jurisdiction over foreign states "differs" from that over agencies and instrumentalities: claims against foreign states must satisfy the first nexus requirement, and claims against agencies and instrumentalities must satisfy the second. 812 F.3d at 146. To be sure, the *Simon* court did not address the Herzog family's precise textual argument. But in a petition for rehearing, the plaintiffs not only raised just that argument, but also claimed that the *Simon* court was bound by *Chabad* to retain the Republic of Hungary as a defendant. Petition for Rehearing at 7, 12, *Simon v. Republic of Hungary*, No. 14-7082

(Feb. 29, 2016). Hardly "unaware" of the supposed intra-circuit conflict, Dissenting Op. at 1, the *Simon* court denied the petition. Applying *Simon* to the facts of this case, we have jurisdiction through only the second clause of the commercial-activity nexus requirement, meaning that the Republic of Hungary retains its FSIA immunity.

Although this is sufficient to resolve the question, even were we not bound by *Simon,* we would hold that a foreign state retains its immunity unless the first clause of the commercial-activity nexus requirement is met. The FSIA carefully distinguishes foreign states from their agencies and instrumentalities. *See, e.g.*, 28 U.S.C. §§ 1603(a)–(b) (defining the terms); 1606 (making punitive damages available against agencies and instrumentalities but not foreign states); 1610 (establishing different procedures for property execution). Though the list of exceptions begins "[a] foreign state shall not be immune," *id.* § 1605, our court has explained that the foreign state itself does not lose immunity merely because one of its agencies and instrumentalities satisfies an FSIA exception; rather, given the Act's "presumption" that agencies and instrumentalities have "independent status" from the foreign state, "'[w]hen a state instrumentality is not immune . . . , the claim is *ordinarily to be brought only against the instrumentality.*'" *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 452 cmt. c (1987)). For that reason, a foreign state loses its immunity under the commercial-activity exception only if the claim against the state—as opposed to the agency or instrumentality—satisfies that exception. *See id.* at 446–47 ("[A]bsent an agency relationship, the court lacks subject matter jurisdiction over the foreign state for the acts of its instrumentality.").

The same is true for the expropriation exception. A foreign state loses its immunity if the claim against it satisfies the exception by way of the first clause of the commercial-activity nexus requirement; by contrast, an agency or instrumentality loses its immunity if the claim against it satisfies the exception by way of the second clause.

To conclude that the foreign state loses its immunity if either clause is satisfied would produce an anomalous result: the court would have no jurisdiction over the agencies and instrumentalities that actually own or operate the expropriated property. That is because, although the FSIA generally allows for "an agency or instrumentality of a foreign state" to count as a "foreign state," *id.* § 1603, the agencies or instrumentalities would fail to satisfy *either* of the expropriation exception's two clauses if considered to be the relevant "foreign state" throughout the exception. Take this case. The family would be unable to pursue its claims against the very entities that actually possess the Herzog collection—the museums and the university—because the collection is not "present in the United States" (clause one) nor "owned or operated by an agency or instrumentality" of the museums and the university (clause two). Thus, the expropriation exception's two clauses make sense only if they establish alternative thresholds a plaintiff must meet depending on whether the plaintiff seeks to sue a foreign state or an agency or instrumentality of that state.

Collapsing the well-worn distinction between foreign states and agencies and instrumentalities would likewise lead to odd results. Because a foreign state would be amenable to suit whenever its agency or instrumentality is not immune, a plaintiff would be able to sue a foreign state with no commercial activity in the United States so long as the agency or instrumentality owning the property in issue is engaged in a commercial activity in the United States. In other words—and

counterintuitively—a plaintiff (1) could more easily obtain jurisdiction over a foreign state if the expropriated property is possessed not by it, but by one of its agencies or instrumentalities, and (2) could sue any and all agencies and instrumentalities of a foreign state however unconnected to the United States, so long as the foreign state itself possesses the property in connection with a commercial activity carried on in the United States. This expansive reading of the expropriation exception makes little sense given that the provision targets specific expropriated property. It is hardly surprising, then, that such a reading was rejected by *Simon* and the only other circuit to have addressed the question. *See Garb v. Republic of Poland*, 440 F.3d 579, 589 (2d Cir. 2006) (explaining that the first nexus requirement "sets a higher threshold of proof for suing foreign states in connection with alleged takings"); FEDERAL JUDICIAL CENTER, THE FOREIGN SOVEREIGN IMMUNITIES ACT: A GUIDE FOR JUDGES 58–59 (2013) ("As is often the case under the FSIA, standards established for the foreign state differ from those established for its agencies and instrumentalities.").

### III.

This leaves three issues.

First, the remaining defendants—the museums and the university—argue that the claims of Erzsébet Weiss de Csepel, the Herzog daughter who became a United States citizen in 1952, *supra* at 4, are barred by a 1973 agreement between the United States and Hungary under which Hungary paid the United States $18.9 million "in full and final settlement and in discharge of all claims of the Government and nationals of the United States against the Government and nationals of the Hungarian People's Republic." Agreement between the Government of the United States of America and the Government of the Hungarian People's Republic Regarding

the Settlement of Claims, Mar. 6, 1973, 24 U.S.T. 522 art. 1. Although, as the district court explained, the 1973 agreement could not have extinguished claims in any work of art taken from Erzsébet before she became a citizen in 1952, *see de Csepel*, 808 F. Supp. 2d at 133–34, the remaining defendants insist that Hungary did take some of the art from Erzsébet after she became a citizen. This is true with respect to two paintings—the Cranach and the Opie—but those two paintings are no longer at issue in this case. *See de Csepel*, 169 F. Supp. 3d at 167 (dismissing the Cranach and Opie paintings).

Defendants point to record evidence suggesting that other paintings may also have been taken from Erzsébet after she became a citizen. *See* Appellants' Reply Br. at 10 n.7 (identifying twelve paintings). The family disagrees, claiming that only the Cranach and Opie paintings were seized after 1952. *See* Appellees' Br. at 54–55 & n.15. Because we are remanding the case for other reasons, we think it best to leave it to the district court to address this issue in the first instance as part of its review of the artwork returned and retaken by Hungary.

Defendants next argue, separate and apart from their FSIA immunity defense, that the Herzog family should have to exhaust its claims in Hungarian courts, as well as through a recently created formal claims process. *See de Csepel*, 169 F. Supp. 3d at 169. *Compare Chabad*, 528 F.3d at 948 (stating it is "likely correct" that the plaintiff "was not required to exhaust Russian remedies before litigating in the United States"), *with Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 859 (7th Cir. 2015) (requiring "prudential exhaustion . . . based on international comity concerns"). This argument ignores the source of our appellate jurisdiction, *i.e.*, the collateral order doctrine.

As a general rule, appellate jurisdiction extends only to "final decisions" of a district court, 28 U.S.C. § 1291, and parties may not appeal where, as here, the district court has simply denied a motion to dismiss. *Kilburn*, 376 F.3d at 1126. It is nonetheless well settled that denial of a motion to dismiss on the ground of sovereign immunity is "final" by application of the collateral order doctrine and "therefore subject to interlocutory review." *Id.* This is why we have appellate jurisdiction to consider Hungary's FSIA arguments.

Hungary, however, has made no argument that the collateral order doctrine applies to denial of a motion to dismiss on freestanding exhaustion grounds. *See Simon*, 812 F.3d at 148 (observing that "the FSIA itself imposes no exhaustion requirement"); *see also Swint v. Chambers County Commission*, 514 U.S. 35, 49–51 (1995) (explaining that the collateral-order exception applies to claims, rather than cases); *Stewart v. Oklahoma*, 292 F.3d 1257, 1260 (10th Cir. 2002) (addressing an Eleventh Amendment defense through the collateral order doctrine but holding that a failure-to-exhaust defense is not "independently subject to the collateral order doctrine"). True, the *Simon* court considered several exhaustion arguments, but that case came to us on appeal from a final order dismissing the entire suit. *Simon*, 812 F.3d at 132, 146–49. Asked about our appellate jurisdiction at oral argument, counsel for Hungary said "I'll be honest, Your Honor, you've got me there." Oral Arg. Tr. 11:15–13:15.

Finally, the Herzog family asks that should we dismiss any of their claims, they be allowed to amend their complaint in light of the Holocaust Expropriated Art Recovery Act of 2016. Pub. L. 114–308, 130 Stat. 1524. Passed during the pendency of this appeal, that statute rests on Congress's finding that "[v]ictims of Nazi persecution and their heirs have taken legal action in the United States to recover Nazi-confiscated art," but

"[t]hese lawsuits face significant procedural obstacles partly due to State statutes of limitations." *Id.* § 2(6). The Act therefore preempts existing state and federal statutes of limitations for "a civil claim or cause of action . . . to recover any artwork or other property that was lost . . . because of Nazi persecution." *Id.* § 5(a). Plaintiffs whose claims were barred by a statute of limitations now have six years from the enactment of the new statute to file their claims. *Id.* §5(c). Moreover, and crucially for the Herzog family, the Act's new statute of limitations applies to claims "pending in any court on the date of enactment of this Act, including any civil claim or cause of action that is pending on appeal." *Id.* § 5(d)(1).

Defendants urge us to deny the motion because, they say, the family has offered "no explanation" for its failure to bring a straightforward conversion claim from the start. Appellants' Reply Br. at 25. Defendants cannot be serious about this, as in their opening brief they themselves identify the "explanation," *i.e.*, the "statute of limitations obstacle that has been applied in courts around the country." Appellants' Br. at 29–30; *see* D.C. Code § 12-301(2) (imposing a three-year statute of limitations on actions "for the recovery of personal property"). Federal Rule of Civil Procedure 15 directs courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Given that Congress enacted the Holocaust Expropriated Art Recovery Act for the very purpose of permitting claims like these to continue despite existing statutes of limitations, "justice" quite obviously requires that the family be given leave to amend their complaint.

## IV.

We affirm the district court's ruling that the Herzog family's claims to art never returned to them satisfy the FSIA's expropriation exception. With respect to art that was returned to the Herzog family, we remand for the district court to

determine whether the claim to recover each piece may proceed under the expropriation exception. We also instruct the district court to dismiss the Republic of Hungary as a defendant and to grant the Herzog family leave to amend their complaint in light of the Holocaust Expropriated Art Recovery Act. Finally, we dismiss for lack of appellate jurisdiction Hungary's appeal from the denial of its motion to dismiss on exhaustion grounds.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring in part and dissenting from part II.B.2:

The majority decides that the Republic of Hungary is immune from the jurisdiction of the federal courts in this case. I disagree.

Part II.B.2 of the majority's opinion transforms the governing jurisdictional statute to mean the opposite of what it says. That distortion of the English language is not all. The majority also dismisses a controlling panel decision thoroughly inconsistent with the majority's conclusion that there is no jurisdiction over the Republic of Hungary. Instead of following that decision, the majority credits a later, contradictory panel decision, a decision bereft of any statutory analysis.

The two decisions dealing with the jurisdictional question presented here are *Agudas Chasidei Chabad of United States v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008), and the later decision in *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016). *Chabad* and *Simon* cannot be reconciled, at "first glance" and every later glance. Maj. Op. 17. Both were expropriation cases in which jurisdiction over the foreign state rested on the commercial activities of the foreign state's agencies and instrumentalities in the United States. *Chabad* upheld jurisdiction over the foreign state. *Simon* decided the opposite, apparently unaware of the intra-circuit conflict it was thereby creating. (After *Simon* came down the district court noticed the obvious intra-circuit conflict *Simon* caused. *See Philipp v. Fed. Republic of Germany*, No. 15-266 (CKK), 2017 WL 1207408, at *9 (D.D.C. March 31, 2017).)

As between *Chabad* and *Simon*, the earlier *Chabad* decision controls for the reasons Judge Sentelle stated for our court in *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011). Under *Chabad*, the district court in this case therefore had jurisdiction over the Republic of Hungary. I will have more to

say about *Chabad* and *Simon* in a moment. But it will be useful to examine first the majority's efforts to fill in a rationale for the result in *Simon*, a rationale missing from the *Simon* opinion itself.

The expropriation or "takings" exception in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(3), states as follows, with my italics added:

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . (3) in which rights in property taken in violation of international law are in issue and that property . . . *is owned or operated by an agency or instrumentality of the foreign state . . . engaged in a commercial activity in the United States.*

*See Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017), quoting the same portion of the statute in a case dealing with jurisdiction over a foreign state.

Hungary's immunity thus should have depended on three easily-answered questions. Is the Republic of Hungary a "foreign state"? Of course it is. *See* Maj. Op. 16. Are "rights in property taken in violation of international law" "in issue"? The answer is clearly yes. *See* Maj. Op. 14. And is "that property" "owned or operated by an agency or instrumentality of the foreign state . . . engaged in a commercial activity in the United States"? Once again – yes. *See* Maj. Op. 16.

Yet the majority decides that Hungary is immune from suit. The apparent basis for its conclusion is that the italicized portion of § 1605(a)(3), quoted above, does not divest a "foreign state" of immunity. Although § 1605(a)(3) provides that a foreign

state shall *not* be immune from suit, the majority crosses out the "not" and holds that the foreign state shall be immune when its agencies or instrumentalities owning or operating the expropriated property engage in commercial activity in the United States.

In trying to explain why § 1605(a)(3) should be treated as if it means the opposite of what it actually provides, the majority invokes § 1606 and § 1610 of the Act, sections that differentiate foreign states from their agencies and instrumentalities. *See* Maj. Op. 21 (citing 28 U.S.C. §§ 1606 & 1610). One of these sections (§ 1606) exempts foreign states, "except for an agency or instrumentality thereof," from liability for punitive damages. The other section (§ 1610) sets forth procedures for attaching the property of a foreign state, procedures that differ from those for attaching the property of a foreign state's agency or instrumentality. Both sections deal with remedies, not a foreign state's immunity from suit.

Neither section suggests that Hungary is not a foreign state. The Act defines "foreign state" to include the foreign state's agencies and instrumentalities. 28 U.S.C. § 1603(a). The sections the majority cites are arguably exceptions to that definition. It is one thing to say that a "foreign state" under the Act does not always include agencies and instrumentalities. Those sections may stand for that proposition. But the majority advances an entirely different proposition – namely, that the term "foreign state" in § 1605(a)(3) somehow does not include a "foreign state."

To support this *non sequitur*, the majority enlists *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990). The case has no logical connection to the issue at hand. On the page the majority cites, the *Foremost-McKesson* court was not interpreting "foreign state," or any

statutory text for that matter. Instead, the court was addressing an antecedent issue to the immunity exceptions. Specifically, the issue was whether "the government of Iran exercised the necessary degree of control over the other [instrumentality] defendants to create a principal/agent relationship and thus permit this court to deem Iran responsible for their actions." *Id.* at 445 (citation omitted). No one argues here that Hungary is being called to answer for the wrongs of its instrumentalities; all agree that this case involves a "family's decades-long effort to recover a valuable art collection that the World-War-II–era Hungarian government and its Nazi collaborators seized during their wholesale plunder of Jewish property during the Holocaust." Maj. Op. 2. *Foremost-McKesson* thus offers no support to the majority's view of § 1605(a)(3). The distinction between foreign states and their instrumentalities simply does not matter on the question whether Hungary is a foreign state.[1]

---

[1] Because the majority relies on this distinction, it is worth making one additional point. The majority concludes that a "foreign state loses its immunity if the claim against it satisfies the exception by way of the first clause of the commercial-activity nexus requirement; by contrast, an agency or instrumentality loses its immunity if the claim against it satisfies the exception by way of the second clause." Maj. Op. 22. This supposed neat distinction between foreign states and their instrumentalities is belied not only by the Act defining "foreign state" to *include* agencies and instrumentalities, 28 U.S.C. § 1603(a), but also by the House Report on the Act explicitly adopting this definition for the expropriation exception. *See* H.R. Rep. No. 94-1487, pp. 18, 19 (1976). This definition of "foreign state" also dispels the majority's notion that reading the statute for what it says would result in the court having "no jurisdiction over the agencies and instrumentalities that actually own or operate the expropriated property." Maj. Op. 22. That argument only works if "foreign state" means *either* the foreign state *or* its instrumentalities – but the term includes both.

The Supreme Court, in its latest opinion on the Foreign Sovereign Immunities Act, cited the Restatement (Fourth) of Foreign Relations Law: Sovereign Immunity § 455 (Tent. Draft No. 2, March 21, 2016). *See Helmerich & Payne Int'l Drilling*, 137 S. Ct. at 1321. As one would expect, the Restatement provides a clear articulation of the expropriation exception to a foreign state's immunity. Section 455 states:

> Courts in the United States may exercise jurisdiction over a foreign state in any case in which rights in property taken in violation of international law are in issue when
> > (a) that property (or any property exchanged for such property) is present in the United States in connection with a commercial activity carried on by that foreign state in the United States; or
> > (b) that property (or any property exchanged for such property) is owned or operated by an agency or instrumentality of a foreign state and that agency or instrumentality is engaged in commercial activity in the United States.

Reporter Note 6 then addresses the issue in this case directly. "Some courts," the Note says, "have allowed actions under the second 'prong' of this exception to be brought against the foreign state in question rather than the agency or instrumentality. *See, e.g.*, *Augudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992); *de Csepel v. Republic of Hungary*, 808 F. Supp. 2d 113 (D.D.C. 2011), *aff'd on other grounds*, 714 F.3d 591 (D.C. Cir. 2013)."[2]

---

[2] The Restatement and majority both note a contrary decision in the Second Circuit. *See Garb v. Poland*, 440 F.3d 579, 589 (2d Cir.

Notice that the Reporter cites *Chabad* as a case in which the court decided that the italicized language from § 1605(a)(3), set forth above, conferred jurisdiction over the foreign state itself. Yet the majority denies that *Chabad* so ruled and on that basis concludes that the later-issued opinion in *Simon*, contrary to *Chabad*, controls. The majority is mistaken. The briefs of the parties discussed the italicized portion of § 1605(a)(3) at some length for the quite apparent reason that the plaintiffs relied on that portion of the statute to strip Russia of its immunity. *See* Opening Brief for Chabad at 48, *Chabad*, 528 F.3d 934.

As I briefly discussed in the beginning of this dissent, the majority's failure to follow *Chabad* is clear error. Consider the majority's statement that in *Chabad* the "issue of the Russian state's immunity was completely unaddressed by the district court and neither raised nor briefed on appeal . . .." Maj. Op. 18. There are two assertions here. The first deals with the district court's opinion, the second with what the parties argued on appeal. Both are wrong.

As to the majority's first assertion, District Judge Lamberth's comprehensive opinion in *Chabad* refutes it. On page after page Judge Lamberth discusses and ultimately agrees with Chabad's claim that jurisdiction over Russia – that is, Russia's lack of immunity – required that "the entity that owns or operates the property at issue '*be engaged in* a commercial activity in the United States.' § 1605(a)(3) (emphasis added)." 466 F. Supp. 2d 6, 24 (D.D.C. 2006). Judge Lamberth's opinion

2006); Maj. Op. 23. Courts in the Second Circuit have concluded that the relevant language in *Garb* was dicta. *See Freund v. Republic of France*, 592 F. Supp. 2d 540, 561 n.10 (S.D.N.Y. 2008). *See also Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 205-06 (2d Cir. 2016).

then begins an extended analysis of the clause in § 1605(a)(3) I have italicized above. *Id.* at 24-25. The majority here also fails to notice that there were two separate alleged expropriations in *Chabad*, one dealing with what the parties called the "Archive," the other dealing with the "Library." Maj. Op. 18, 19. Judge Lamberth determined that Russia had no immunity regarding the "Archive" expropriation, but had immunity regarding the "Library" expropriation. 466 F. Supp. 2d at 31. Both sides appealed. *Chabad*, 528 F.3d at 939.

On appeal, Russia argued in its brief that "commercial activity" in the italicized clause in § 1605(a)(3) – which Chabad had relied upon (466 F. Supp. 2d at 23-24) – should be interpreted to require "substantial contact" with the United States. *See* Opening Brief for Russia at 41-42, *Chabad*, 528 F.3d 934. Otherwise, Russia argued, there would be an anomaly: plaintiffs could more easily establish jurisdiction over a foreign state based on the commercial activity of its agencies and instrumentalities than based on the activity of the foreign state itself. *Id.* The Chabad plaintiffs countered that the "plain language" of the § 1605(a)(3) clause italicized above conferred jurisdiction over the foreign state without any substantiality requirement and that if this should be altered, it was up to Congress not the courts. Opening Brief for Chabad at 50-51, *Chabad*, 528 F.3d 934. On appeal, our court acknowledged Russia's "anomaly" argument regarding the italicized clause in § 1605(a)(3), 528 F.3d at 947, and expressly rejected it. *Id.*

Yet the majority in this case now resurrects Russia's argument and claims that treating the italicized clause in § 1605(a)(3) as establishing jurisdiction over Hungary would produce an "anomalous result." Maj. Op. 22-23. The majority seems quite unaware that the "anomaly" argument it puts forward is the argument the *Chabad* court flatly rejected on appeal. The briefs in *Chabad* make the majority's error clear.

The short of the matter is that the appellate decision in *Chabad* is controlling. The Supreme Court has instructed that "it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996), quoted in *Citizens for Responsibility & Ethics in Washington v. United States Dep't of Justice*, 846 F.3d 1235, 1244 (D.C. Cir. 2017). The result in *Chabad* was clear: the court affirmed the district court's judgment upholding jurisdiction over Russia with regard to the "Archive" claim and reversed the district court's judgment granting Russia immunity on the "Library" claim. *Chabad*, 528 F.3d at 948, 955; *see Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 729 F. Supp. 2d 141, 143, 148 (D.D.C. 2010) (exercising jurisdiction over Russia on remand). Both jurisdictional decisions rested on the italicized portion of § 1605(a)(3) that the plaintiffs in this case clearly satisfied. *See* Maj. Op. 17. When, in the Supreme Court's words in *Seminole Tribe,* one looks to the "portions of the opinion necessary to that result," one finds ample reasoning in support over multiple pages. *See Chabad*, 528 F.3d at 946-48. *Chabad* examined whether Russia's agencies and instrumentalities were "engaged in a commercial activity in the United States" and found this "alternative" clause in § 1605(a)(3) "plainly satisfied." 28 U.S.C. § 1605(a)(3); *Chabad*, 528 F.3d at 948. On that basis, it determined that Russia did not have immunity from the jurisdiction of the federal courts. *Chabad*, 528 F.3d at 955.

The majority dismisses the reasoning of *Chabad* because it believes that a "foreign state" in § 1605(a)(3) may sometimes not be a "foreign state." Having adopted this unfounded reading of the statute, the majority then faults *Chabad* for not explicitly addressing it. It bears repeating that *Chabad* upheld jurisdiction over Russia. Why? Because the italicized portion of § 1605(a)(3) removed Russia's immunity in light of the commercial activities of Russia's agencies and instrumentalities

in the United States.  The *Chabad* decision is clearly precedential, whether or not the opinion responded to every conceivable misreading of the statute.

In the later decision in *Simon*, the panel recognized that the relevant portion of *Chabad* had precedential effect.  Without explanation, it cited that precise portion in reaching its contrary and counter-textual interpretation of the expropriation exception.  *See Simon*, 812 F.3d at 146 (citing *Chabad*, 528 F.3d at 947).  *Chabad* was the only case it cited for that result.  *Id.*  The *Simon* panel's one-sentence rehearing denial added nothing.

The only reasonable explanation for *Simon*'s treatment of *Chabad* is that it made a mistake.  The majority's decision in this case only compounds the error.