# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 7, 2021　　　　　Decided March 8, 2022

No. 20-7047

DAVID L. DE CSEPEL, ET AL.,
APPELLEES

v.

REPUBLIC OF HUNGARY, A FOREIGN STATE, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01261)

———

No. 20-8001

IN RE: REPUBLIC OF HUNGARY, ET AL.,
PETITIONERS

———

Petition and Cross-Petition for Permission to Appeal Under
28 U.S.C. § 1292(b) from an Interlocutory Order of the
United States District Court for the District of Columbia
(No. 1:10-cv-01261)

———

*Thaddeus J. Stauber* argued the cause for appellants. With him on the briefs was *Sarah Erickson André.*

*Alycia Regan Benenati* argued the cause for appellees. With her on the brief were *Sheron Korpus* and *David E. Mills.*

Before: TATEL, PILLARD, and JACKSON[*], *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TATEL and *Circuit Judge* PILLARD.

TATEL and PILLARD, *Circuit Judges*: For the third time, we consider a family's decades-long effort to recover a valuable art collection that the World War II-era Hungarian government and its Nazi collaborators seized during their wholesale plunder of Jewish property during the Holocaust. On remand from our second decision, the district court dismissed the family's claims against the Republic of Hungary and permitted the suit to proceed against the remaining defendants, a Hungarian asset management company, a university, and three art museums. The remaining defendants appeal the district court's denial of sovereign immunity, and the parties also seek our discretionary review of additional issues. For the reasons explained below, we exercise that discretion to review several holdings, and we affirm the district court on those that we review.

## I.

We described the background of this case in our earlier opinions, *de Csepel v. Republic of Hungary*, 714 F.3d 591, 594–97 (D.C. Cir. 2013) (*de Csepel I*) and *de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1097–99 (D.C. Cir. 2017) (*de Csepel II*). For the reader's convenience, we repeat it

---

[*] Circuit Judge Jackson was a member of the panel at the time the case was argued but did not participate in this opinion.

virtually in full. Baron Mór Lipót Herzog was a "passionate Jewish art collector in pre-war Hungary" who assembled a collection of more than two thousand paintings, sculptures, and other artworks. Am. Compl. ¶ 37. Known as the "Herzog Collection," this body of artwork was "one of Europe's great private collections of art, and the largest in Hungary," and included works by renowned artists such as El Greco, Velázquez, Renoir, and Monet. *Id.* Following Herzog's death in 1934 and his wife's shortly thereafter, their daughter Erzsébet and two sons István and András inherited the collection. *Id.* ¶ 38.

Then came World War II, and Hungary joined the Axis Powers. In March 1944, Adolf Hitler sent German troops into Hungary, and SS Commander Adolf Eichmann entered the country along with the occupying forces and established headquarters at the Majestic Hotel in Budapest. *Id.* ¶¶ 50, 51 59. During this time, Hungarian Jews were subjected to anti-Semitic laws restricting their economic and cultural participation in Hungarian society and deported to German concentration camps. *Id.* ¶¶ 43, 46, 51. As an integral part of its oppression of Hungarian Jews, "[t]he Hungarian government, including the Hungarian state police, authorized, fully supported and carried out a program of wholesale plunder of Jewish property, stripping anyone 'of Jewish origin' of their assets." *Id.* ¶ 53. Jews "were required to register all of their property and valuables" in excess of a certain value, and the Hungarian government "inventoried the contents of safes and confiscated cash, jewelry, and other valuables belonging to Jews." *Id.* ¶ 54. "[P]articularly concerned with the retention of artistic treasures belonging to Jews," the Hungarian government established "a so-called Commission for the Recording and Safeguarding of Impounded Art Objects of Jews . . . and required Hungarian Jews promptly to register all art objects in their possession." *Id.* ¶ 55. "These art treasures were

sequestered and collected centrally by the Commission for Art Objects," headed by the director of the Hungarian Museum of Fine Arts. *Id.*

In response to widespread looting of Jewish property, the Herzogs "attempted to save their art works from damage and confiscation by hiding the bulk of [them] in the cellar of one of the family's factories at Budafok." *Id.* ¶ 57. Despite these efforts, "the Hungarian government and their Nazi[] collaborators discovered the hiding place" and confiscated the artworks. *Id.* ¶ 58. They were "taken directly to Adolf Eichmann's headquarters at the Majestic Hotel in Budapest for his inspection," where he "selected many of the best pieces of the Herzog Collection" for display near Gestapo headquarters and for eventual transport to Germany. *Id.* ¶ 59. "The remainder was handed over by the Hungarian government to the Museum of Fine Arts for safekeeping." *Id.* After seizure of the collection, a pro-Nazi newspaper ran an article in which the director of the Hungarian Museum of Fine Arts boasted that the "'Herzog collection contains treasures the artistic value of which exceeds that of any similar collection in the country. . . . If the state now takes over these treasures, the Museum of Fine Arts will become a collection ranking just behind Madrid.'" *Id.* ¶ 58.

"Fearing for their lives, and stripped of their property and livelihoods, the Herzog family was forced to flee Hungary or face extermination." *Id.* ¶ 62. Erzsébet Herzog (Erzsébet Weiss de Csepel following her marriage) fled Hungary with her children, first reaching Portugal and eventually settling in the United States, where she became a U.S. citizen in 1952. *Id.* István Herzog was nearly sent to Auschwitz but "escaped after his former sister-in-law's husband . . . arranged for him to be put in a safe house under the protection of the Spanish Embassy." *Id.* ¶ 41. "He died in 1966, leaving his estate to his

two sons, Stephan and Péter Herzog, and his second wife, Mária Bertalanffy." *Id*. András Herzog was "sent . . . into forced labor in 1942 and he died on the Eastern Front in 1943." *Id*. ¶ 40. His daughters, Julia Alice Herzog and Angela Maria Herzog, fled to Argentina and eventually settled in Italy. *Id*. ¶¶ 40, 63.

Following the end of World War II, the Herzog family began a seven-decade effort to reclaim the art collection, including through the Hungarian courts. *de Csepel II*, 859 F.3d at 1098. When those efforts proved unsuccessful, three heirs to the collection — Erzsébet's son David L. de Csepel, along with András's daughters Julia Alice and Angela Maria Herzog (collectively, "the family") — filed suit in U.S. district court. The family brought the suit against the Republic of Hungary, three art museums — the Budapest Museum of Fine Arts, the Hungarian National Gallery, and the Budapest Museum of Applied Arts — and the Budapest University of Technology and Economics. Compl. ¶¶ 9–13. The family alleges that Defendants' possession or re-possession of at least forty pieces of the Herzog Collection following World War II "constituted one or more express or implied bailment contracts" and that Defendants' failure to return the artworks upon demand breached the bailment contracts and constituted conversion and unjust enrichment. Am. Compl. ¶¶ 16, 99–123, 139–142. The family seeks imposition of a constructive trust, an accounting, and a declaration of its ownership of the Herzog Collection, all aimed at either recovering the artwork or obtaining over $100 million in compensation. *Id.* ¶¶ 124–38 & pt. V.

This dispute first arrived in our court in 2013, and the question before us then was whether the suit was barred by the Foreign Sovereign Immunities Act ("FSIA"). *de Csepel I*, 714 F.3d at 597. "That Act authorizes federal jurisdiction over civil actions against foreign states, as relevant here, only in certain

cases involving expropriated property or commercial activity, and only to the extent such jurisdiction is not inconsistent with certain international agreements." *de Csepel II*, 859 F.3d at 1099 (citing 28 U.S.C. §§ 1604–05). We rejected Defendants' assertion of sovereign immunity, concluding on the pleadings that the family's claims satisfied the FSIA's commercial activity exception and that jurisdiction was not inconsistent with agreements between the United States and Hungary. *de Csepel I*, 714 F.3d at 597–603.

This dispute returned to our court after the district court, following the close of discovery, concluded that, as the evidentiary record had developed, the commercial activity exception did not apply but the action could nonetheless proceed under the FSIA's expropriation exception. *de Csepel II*, 859 F.3d at 1099. We affirmed the district court's conclusion that the expropriation exception applied to "twenty-five or so artworks taken by Hungary during the Holocaust and never returned." *Id.* at 1103. But we remanded for the district court to consider whether the expropriation exception applies to nineteen artworks that were temporarily returned to members of the Herzog family. *Id.* at 1103–04. We instructed the district court to (1) dismiss the Republic of Hungary because it enjoys immunity under the FSIA and (2) "grant the Herzog family leave to amend their complaint in light of the Holocaust Expropriated Art Recovery Act" of 2016 ("HEAR Act"). *Id.* at 1107, 1110.

Back in the district court, the family filed an amended complaint that referenced the HEAR Act and added a new defendant, Hungarian National Asset Management Inc. ("MNV"), which exercises ownership rights over and manages certain Hungarian assets. Am. Compl. ¶¶ 3, 14, 87–98. The district court dismissed the Republic of Hungary in accordance with our directive, and rejected Defendants' arguments that

MNV is not a proper party to this suit and that this action may not proceed against the remaining defendants in Hungary's absence. *de Csepel v. Republic of Hungary*, No. 10-cv-01261, 2020 WL 2343405, at *5–6, 10, 17, 33 (D.D.C. May 11, 2020) (*Remand II*). The court retained jurisdiction over five of the nineteen artworks that were temporarily returned to the Herzog family, holding that the FSIA's expropriation exception applied to these pieces. *Id.* at *19, 35.

Defendants now appeal, seeking dismissal of the family's suit in its entirety. They argue that MNV is shielded by Hungary's sovereign immunity, that the district court violated this court's mandate in *de Csepel II* by allowing amendment of the complaint to add Defendant MNV, that Federal Rule of Civil Procedure 19 bars this action from continuing against the remaining defendants, that the principle of prudential exhaustion requires dismissal of this action, and that the district court lacks jurisdiction regarding the five artworks that were temporarily returned to the family. The family defends the district court's decision but asks that, should we review whether the court properly exercised jurisdiction over the five artworks, we also consider whether the district court erred in dismissing claims to twelve of the other fourteen artworks for lack of jurisdiction.

We have appellate jurisdiction to consider whether MNV is immune from suit under the FSIA. *de Csepel II*, 859 F.3d at 1099 ("It is . . . well settled that denial of a motion to dismiss on the ground of sovereign immunity is 'final' by application of the collateral order doctrine and 'therefore subject to interlocutory review.'" (citation omitted)). Because the district court certified its order for immediate appellate review, we also have discretion to consider Defendants' remaining arguments, and we explain below the extent to which we exercise that discretion and our corresponding dispositions. *See* 28 U.S.C.

1292(b) (permitting an appellate court to, "in its discretion," consider an interlocutory appeal where the district judge certifies that the "order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation"); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1002 n.2 (D.C. Cir. 1986) (holding that, where a district court certifies an issue for appeal, the court of appeals "must decide *all* questions of law necessary to the proper disposition of [the] appeal").

## II.

The family's amended complaint added MNV, a state-owned company that exercises Hungary's ownership rights over certain governmental assets, including the artworks at issue in this case. Am. Compl. ¶¶ 14, 36. Defendants argue that MNV is entitled to sovereign immunity and that the district court violated this court's mandate in *de Csepel II* by permitting the family to add MNV to its amended complaint.

The FSIA provides that a foreign state, including any political subdivision, agency, or instrumentality thereof, "shall be immune from the jurisdiction of the courts of the United States" subject to certain exceptions. 28 U.S.C. § 1604; *see id.* § 1603(a). Under the expropriation exception, a foreign sovereign loses its immunity if "'rights in property taken in violation of international law are in issue,'" and "there is an adequate commercial nexus between the United States and the defendants." *de Csepel II*, 859 F.3d at 1101 (quoting 28 U.S.C. § 1605(a)(3)). The commercial-activity nexus requirement is met if (1) the property in issue "is present in the United States in connection with a commercial activity carried on in the United States by the foreign state" or (2) that property "is owned or operated by an agency or instrumentality of the

foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). As we explained in *de Csepel II*, "[a] *foreign state* loses its immunity if the claim against it satisfies the exception by way of the first clause of the commercial-activity nexus requirement; by contrast, an *agency or instrumentality* loses its immunity if the claim against it satisfies the exception by way of the second clause." *de Csepel II*, 859 F.3d at 1107 (emphasis added); *Simon v. Republic of Hungary*, 812 F.3d 127, 146 (D.C. Cir. 2016) (holding that the first clause applies to claims against the foreign state itself, whereas the second clause applies to claims against an agency or instrumentality of the foreign state).

The Herzog Collection is located outside the United States, so the family's claims fall within the expropriation exception only if the Collection is owned or operated by an "agency or instrumentality" of Hungary. *See de Csepel II*, 859 F.3d at 1107 (describing the application of the expropriation exception to an "agency or instrumentality" versus the "foreign state" itself). Defendants do not contest that they are "engaged in a commercial activity in the United States." *See de Csepel II*, 859 F.3d at 1104. Thus, whether the family may invoke this exception to establish federal jurisdiction over MNV turns on whether MNV is an agency or instrumentality of Hungary or, rather, the foreign state itself. The family argues that MNV is an agency or instrumentality of Hungary, as evidenced by MNV's commercial functions analogous to those performed by private entities. Defendants argue that MNV is "a 'Political Organ' of the Hungarian State" and, as such, constitutes the foreign state itself. Appellants' Br. 18.

Because the family asserts jurisdiction under the FSIA and Defendants assert the jurisdictional defense of immunity, Defendants bear the burden of proving that the family's

allegations do not bring this case within a statutory exception to immunity. *Belize Social Development Ltd. v. Government of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015). And because Defendants "challenge[] the factual basis of the court's jurisdiction, . . . the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting Inc. v. Republic on Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). Our review is de novo. *de Csepel II*, 859 F.3d at 1099.

To determine whether MNV is an agency or instrumentality of Hungary or, rather, Hungary itself, we consider whether its "core functions . . . are governmental or commercial." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994). If MNV's core functions are "commercial, the entity is an agency or instrumentality;" if MNV's core functions are "governmental, it is considered the foreign state itself." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003).

Applying this "core functions" test, we have held that Bolivia's Air Force and Iran's Ministry of Foreign Affairs are the foreign states themselves rather than agencies or instrumentalities. *Transaero*, 30 F.3d at 153 (Bolivia's Air Force); *Roeder*, 333 F.3d at 234 (Iran's Ministry of Foreign Affairs). As we have explained, "[t]he conduct of foreign affairs is an important and indispensable governmental function," *Roeder*, 333 F.3d at 234–35 (internal quotation marks omitted), and "[t]he powers to declare and wage war are among the necessary concomitants of sovereignty," *Transaero*, 30 F.3d at 153 (internal quotation marks omitted). Such entities, therefore, "clearly" fall on the "governmental side." *Roeder*, 333 F.3d at 234.

Although our court has not previously held an entity to be an agency or instrumentality under the core functions test, our colleagues on the district court have held that a South Korean cultural foundation and a Russian library and military archive are state agencies or instrumentalities. *See Smith v. Overseas Korean Cultural Heritage Foundation*, 279 F. Supp. 3d 293, 297 (D.D.C. 2018); *Agudas Chasidei Chabad of United States v. Russian Federation*, 729 F. Supp. 2d 141, 147 (D.D.C. 2010). As the district court has explained, the tasks performed by these entities — the construction and operation of a museum and the reproduction and sale of books and manuscripts — are commercial actions in which private parties regularly engage. *Smith*, 279 F. Supp. 3d at 297 ("building and operating a museum . . . is commercial in nature"); *Agudas*, 729 F. Supp. 2d at 148 (reproducing, selling, and distributing books and manuscripts are "commercial activit[ies]").

Whether MNV's core functions are governmental or commercial is less clear. Under Hungarian law, MNV exercises the "ownership rights and obligations belonging to the State over state assets entrusted to it." Hungarian Act CVI of 2007 on State Assets ("State Property Act") § 3(1), Joint Appendix (J.A.) 2975. It "prepare[s] and/or execute[s] the decisions of Parliament, the Government and the minister relating to state assets," "keep[s] records on state assets," "inspect[s] the operations involving state assets of the persons, organisations or other users that are in a contractual relationship with [MNV]," and "oversee[s] the fulfilment of obligations set out in the sales contracts." State Property Act § 17(1), J.A. 2977. Unlike entities that conduct foreign affairs or military operations, MNV performs property management functions that private entities also perform. *See Republic of Argentina v. Weltover Inc.*, 504 U.S. 607, 614 (1992) ("[T]he foreign sovereign's actions are commercial within the meaning of the FSIA" when they "are the *type* of actions by which a private

party engages in trade and traffic or commerce." (internal quotation marks omitted)). By contrast, a sovereign cannot function without property, and ownership of certain types of property, like public lands, is uniquely governmental. *See id.* (A foreign government's activities are "sovereign" rather than "commercial" when they are activities that "cannot be exercised by a private party." (internal quotation marks omitted)). Given the myriad types of property that can be held privately or as state assets, we cannot conclude that the function of holding and managing property, in and of itself, is "so closely bound up with the structure of the state that [it] must in all cases be considered" a governmental rather than commercial function. *Transaero*, 30 F.3d at 153. Instead, whether the management of state property is governmental or commercial depends on the type of property at issue.

MNV manages state-owned companies, "movable propert[y]," and real property. Declaration of Dr. Bernadette Somody 5–6, *de Csepel v. Hungary*, No. 10-cv-01261 (D.D.C. Mar. 23, 2018), ECF No. 153-1, J.A. 3234–35. It exercises ownership rights over about 450 companies, including "a major Hungarian energy group," "the largest gambling service provider in Hungary," and a "waste management" holding company. *Id.* MNV also manages almost 100,000 state-owned movable properties, including "road vehicles," "musical instruments," and "works of art." *Id.* at 6, J.A. 3235. As for its management of real property, MNV's "main duty . . . is to provide real estate for the performance of state functions and for meeting public demand." *Id.* There is nothing inherently sovereign about managing energy, gambling, or waste. Nor are the acts of maintaining and lending road vehicles, musical instruments, or art pieces governmental in nature, even when these items belong to a sovereign. Indeed, our own district court has held that the act of lending art pieces is commercial, noting that "[l]oans between and among museums (both public

and private) occur around the world regularly." *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D.D.C. 2005). Finally, although providing real estate for state functions appears governmental, providing real estate to "meet[] public demand" is a function routinely performed by private real estate developers. MNV's core functions, then, are predominantly commercial rather than governmental. *See Transaero*, 30 F.3d at 151 (The question is "whether the core functions of the foreign entity are predominantly governmental or commercial.").

Defendants point out that Hungary's State Property Act provides that "'[t]he tasks conferred upon MNV . . . [are] government functions.'" Appellants' Br. 19 (quoting State Property Act § 17(2), J.A. 2977). Although "MNV may engage in certain activities that might be considered 'commercial' in nature," Defendants argue, MNV does so "'within the framework of government functions,'" as specified by the State Property Act. *Id.* at 19–20 (quoting State Property Act § 17(1)(h), J.A. 2977). But if simply labeling MNV's activities as "governmental" were sufficient under the core functions test, the test would be highly manipulable; any foreign sovereign wishing to insulate an agency or instrumentality from suit could simply declare that the entity's functions are "government functions."

Defendants analogize MNV to the Polish Ministry of Treasury, which the Second Circuit held in *Garb v. Republic of Poland* constituted the Polish state itself rather than an agency or instrumentality of Poland. 440 F.3d 579, 598 (2d Cir. 2006). Defendants' comparison is unpersuasive. *Garb* held that the Ministry of Treasury's "core function — to hold and administer the property of the Polish state — [was] indisputably governmental." *Id.* at 594. Beyond this statement, *Garb* neither indicated what types of property the Ministry managed nor

explained why the Ministry's management of property was governmental in nature. As noted above, holding and administering property is not *per se* governmental due to the myriad property types that private and public entities alike can hold and manage. Without any indication of the type of property that the Polish Ministry administered, we cannot determine whether that entity is comparable to MNV.

Because MNV's management of companies, movable property, and real property is overwhelmingly commercial in nature, we conclude that MNV is an agency or instrumentality of Hungary rather than the foreign state itself. As such, MNV falls within the FSIA's expropriation exception.

Having concluded that the district court properly exercised jurisdiction over MNV, we turn to Defendants' argument that, by permitting the family to add MNV to its amended complaint, the district court violated our directive in *de Csepel II* to "grant the Herzog family leave to amend their complaint in light of the Holocaust Expropriated Art Recovery Act." *de Csepel II*, 859 F.3d at 1110. Under the law-of-the-case doctrine, courts may not revisit issues already decided "'explicitly or by necessary implication'" in the same case. *Independent Petroleum Association of America v. Babbitt*, 235 F.3d 588, 597 (D.C. Cir. 2001) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1394 (D.C. Cir. 1996) (en banc)). But, as the district court observed, the issue whether the family could add MNV to the amended complaint was not before us in *de Csepel II*, nor was it decided by necessary implication. *Remand II*, 2020 WL 2343405, at *6. Our decision to allow the family to amend its complaint in one respect did not preclude the family from amending it in other respects. *Cf. United States v. Kennedy*, 682 F.3d 244, 253–54 (3d Cir. 2012) (holding that where the court of appeals "qualif[ied its] mandate with the term 'only,'" the district court "ventured beyond the scope of

[the] mandate" by considering extraneous issues). Accordingly, the family's addition of MNV in its amended complaint did not contravene this court's mandate in *de Csepel II*. As the district court concluded, MNV is a proper party to this suit.

## III.

Defendants also challenge the district court's denial of their Rule 12(b)(7) motion to dismiss for failure to join an indispensable party. *See Remand II*, 2020 WL 2343405, at *12–17 (citing FED. R. CIV. P. 19(a)–(b)). The district court held that even assuming Hungary was a "required" party, it is not indispensable because this suit may proceed "in equity and good conscience" without it. *Id.* "We review the district court's application of Rule 19(b)'s equity and good conscience test for abuse of discretion, but questions of law that inform a district court's Rule 19 determination are reviewed *de novo*." *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 465 (D.C. Cir. 2017) (cleaned up).

We conclude that Hungary qualifies as a required party, but we also affirm the district court's well-reasoned determination that this action may proceed among the existing parties "in equity and good conscience." FED. R. CIV. P. 19(b). Hungary's interests are so aligned with those of the remaining defendants that their participation in the litigation protects Hungary against potential prejudice from the suit proceeding in its absence. Rule 19 thus does not require that the case be dismissed.

As noted above, we have discretion to review issues beyond the denial of MNV's claim of immunity. We exercise that discretion to consider the district court's Rule 19 determination that this case may proceed in Hungary's absence. This issue involves a controlling question of law

because it would require reversal if decided incorrectly. There are no decisions directly on point in our circuit and, because the issue is potentially dispositive of the case, resolving it now could avoid unnecessary burdens of further litigation.

Rule 19 analysis has two steps. We first determine whether an absent party is "required," FED R. CIV. P. 19(a), and, if so, we ask "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." FED R. CIV. P. 19(b).

A party is "required" under Rule 19(a)(1) if it meets either of two conditions:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1).

Hungary's interest in the action fits Rule 19(a)(1)(B)'s general description, as well as the particular risk identified in subclause (B)(i). First, Hungary "claims an interest relating to the subject of the action" because it asserts ownership rights over the disputed artworks and seeks to avoid liability on the

family's claims that Hungary unlawfully took them. *See* FED. R. CIV. P. 19(a)(1)(B); Appellants' Br. 34–41. Those interests raise the question whether Hungary is so situated that proceeding in its absence might lead to one of the problems identified in subclause (B)(i) or (ii). Defendants invoke subclause (B)(i), asserting this litigation might "as a practical matter impair or impede [Hungary's] ability to protect the interest[s]" it claims. FED. R. CIV. P. 19(a)(1)(B)(i). Whether Hungary has an interest that might be impaired sounds like but is importantly distinct from a second inquiry, described below, as to whether the remaining parties are positioned to protect Hungary's interests. Rule 19(a) calls for identification of potential prejudice, whereas Rule 19(b) requires weighing of the risk of prejudice with other factors to make an equitable determination whether the case must be dismissed.

We conclude that deciding the tort-based conversion claims in Hungary's absence could impair its ability to protect its asserted interests in the artworks. Generally, under Rule 19 "it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp*., 498 U.S. 5, 7 (1990) (per curiam). But Hungary claims a proprietary interest in the same artworks that the family seeks to recover. Because Hungary and the family stake out "opposing, irreconcilable claims to the same" property, resolving this litigation in Hungary's absence undoubtedly could impede Hungary's ability to protect its interest in such property. *See Wach v. Byrne, Goldenberg & Hamilton, PLLC*, 910 F. Supp. 2d 162, 169 (D.D.C. 2012) ("[T]he Court easily finds [the absent party] to be a 'required' party . . . because Plaintiff and [the absent party] lay opposing, irreconcilable claims to the same portion of the limited settlement proceeds."); *see also Brown v. Christman,* 126 F.2d 625, 631 n.23 (D.C. Cir. 1942) ("Generally, where the action involves a determination of

conflicting interests of beneficiaries in a trust fund, the beneficiaries are held to be necessary parties.").

The contract-based bailment claims have similar potential to affect Hungary's interests. The parties contest whether the family's bailments were with Hungary or with representatives of the Hungarian museums. In either event, Hungary claims ownership of the same artworks that the family seeks to recover. As an absent party, Hungary cannot itself make arguments or present evidence in defense of its ownership claim. Impaired in its ability to protect interests it asserts here, it qualifies as a "required" party for purposes of Rule 19(a).

That raises the question whether the action may "in equity and good conscience" proceed in Hungary's absence. FED. R. CIV. P. 19(b). We answer that question based on Rule 19(b)'s four factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>>
>> (B) shaping the relief; or
>>
>> (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

FED. R. CIV. P. 19(b). Application of these factors confirms that Hungary is not an indispensable party, so the suit may in equity and good conscience proceed in its absence.

Whether proceeding in Hungary's absence might prejudice Hungary's interests is the core of the parties' Rule 19 dispute. The first Rule 19(b) factor asks whether a party might suffer prejudice not simply from an adverse result, but specifically from the decision being "rendered in [its] absence." The presence of remaining defendants with interests virtually identical to Hungary's obviates any such risk here. Courts recognize that "prejudice to absent parties approaches the vanishing point" when "the absent and remaining parties' interests are aligned in all respects," *American Trucking Ass'n, Inc. v. New York State Thruway Authority*, 795 F.3d 351, 360 (2d Cir. 2015) (internal quotation marks omitted), including in cases in which the absent party is an immune sovereign, *see Gensetix, Inc. v. Board of Regents of University of Texas System*, 966 F.3d 1316, 1326 (Fed. Cir. 2020); *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013). The logic is straightforward: If a party remaining in the case is both capable of and interested in representing the interests of the absent party, the party's exit or exclusion from the suit exposes it to no additional risk of an adverse decision.

Hungary's interests are closely aligned with those of the remaining defendants in this litigation, particularly MNV. The allegations and the course of the litigation thus far show that at every stage of the case, and even in related litigation twenty years ago, MNV has made controlling decisions for all defendants, including Hungary. *See Remand II*, 2020 WL 2343405, at *15; Am. Compl. ¶ 36, J.A. 499–500; Deposition of Dr. Zoltán Molnar 27–28, 45–46, *de Csepel v. Hungary*, No. 10-cv-01261 (D.D.C. Mar. 23, 2018), ECF No. 153-24, J.A. 3529–32. Hungary's State Property Act appears to require that

MNV represent Hungary in civil actions involving state property. State Property Act § 17(1)(e); Declaration of Zoltán Novák 51, *de Csepel v. Hungary*, No. 10-cv-01261 (D.D.C. Mar. 23, 2018), ECF No. 148-29, J.A. 2977. MNV is thus "fully able" to "step into [Hungary's] shoes and protect [Hungary's] interests." *Gensetix*, 966 F.3d at 1326. MNV is both "capable of and willing to make [all of Hungary's] arguments." *Alto*, 738 F.3d at 1127 (internal quotation marks omitted).

Defendants assert that Hungary's interests are distinct insofar as Hungary purports to own the disputed artworks that MNV, the museums, and the university merely possess on its behalf. Appellants' Br. 48; Reply Br. 17. But Defendants have not identified how that distinction could impair Hungary's interests. At bottom, both Hungary and the remaining defendants seek the same result: to retain the artwork and avoid any monetary, equitable, or declaratory relief. Defendants thus have "the incentive to make every argument on the merits that the absent [Hungary] would or could make." *Two Shields v. Wilkinson*, 790 F.3d 791, 799 (8th Cir. 2015) (internal quotation marks omitted).

Defendants nonetheless argue that dismissal is compelled here by *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008). That case was an interpleader action by Merrill Lynch in the face of dueling claims to a brokerage account former President of the Republic of the Philippines Ferdinand Marcos had created with the firm. *Id.* at 857–59. Human rights victims sought to enforce a $2 billion default judgment against the account, whereas the Philippine government asserted a competing claim that the account comprised Marcos' unlawful gains from abuse of office that were properly forfeited to the government *ab initio*. *Id.* The sovereign was a "required" party under Rule 19(a), *id.* at 863, so the analysis focused on whether

under Rule 19(b) the case could proceed "in equity and good conscience" without it, *id.* at 864. The Court recognized the importance of a sovereign's "[c]omity and dignity interests" under international law, especially in suits arising "from events of historical and political significance" for the sovereign. *Id.* at 866. "[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous," the Court declared, "dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.* at 867. That declaration, Defendants assert, spells the end of this case.

*Pimentel* cannot bear the weight Defendants place on it. *Pimentel* itself reaffirmed that, in assessing the potential for injury, the equitable character of Rule 19(b)'s non-exhaustive list of factors "indicates that the determination whether to proceed will turn upon factors that are case specific." 553 U.S. at 863–64. Defendants contend that "[b]ecause Hungary (1) is an immune sovereign, (2) has a significant interest in its cultural patrimony, and (3) is a required party, the action *must* be dismissed." Appellants' Br. at 45 (emphasis in original). But if the Philippine government's sovereign interest in the disputed issues were alone dispositive in *Pimentel*, as Defendants assert, the Court would have ended the inquiry there. Instead, it proceeded to weigh each of the Rule 19(b) equitable factors. *Id.* at 865–72.

Importantly, the Court in *Pimentel* examined what, if anything, might protect the Philippines' interests were the case to proceed in its absence. The key Rule 19(b) factors for that purpose were the first two — potential prejudice, and measures to mitigate it. As to the potential prejudice from proceeding in the Philippines' absence, the Supreme Court noted that the court of appeals had effectively brushed off any sovereign interest in claims it thought were likely time barred. The

Supreme Court deemed that approach impermissible as a matter of law:

> [I]t was improper to issue a definitive holding regarding a nonfrivolous, substantive claim made by an absent, required entity that was entitled by its sovereign status to immunity from suit. That privilege is much diminished if an important and consequential ruling affecting the sovereign's substantial interest is determined, or at least assumed, by a federal court in the sovereign's absence and over its objection.

*Id*. 868–69. On the second factor — the availability of measures to lessen or avoid the prejudice — the Court determined that there was "no substantial argument" in favor of allowing the "action to proceed," and noted that "[n]o alternative remedies or forms of relief have been proposed to us or appear to be available." *Id.* at 870.

Critically, in *Pimentel* no party with interests aligned with the Philippine government's remained in the case to guard against prejudice in its absence. The interests of the remaining defendants — principally the company former President Marcos had created to hold the embezzled funds at issue — were contrary to those of the Philippine government. And even interpleader plaintiff Merrill Lynch had refused an express governmental request to place the money in escrow — a step that might have mitigated the risk the government faced. *Id*. at 858–59.

The parties' configuration in this case is very different, and the Rule 19(b) inquiry here comes out the other way. Hungary's interests are so aligned with those of the remaining defendants that the latter will vigorously protect Hungary's

interests by pressing their own. The district court acknowledged Hungary's sovereign interests. It spelled out why those interests were not at greater risk in Hungary's absence. And it identified how relief could be tailored if needed to further reduce any potential prejudice. *Remand II*, 2020 WL 2343405, at \*14–17. That is the kind of "case specific" analysis identifying "substantial argument[s]" for allowing the "action to proceed" that *Pimentel* requires. 553 U.S. at 863, 870.

Defendants garner no better support from *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491 (D.C. Cir. 1995). There, as in *Pimentel* but unlike here, the interests of the remaining defendants were misaligned with those of the absent sovereign. The Kickapoo Tribe sued the U.S. Secretary of Interior for failing to timely approve a compact it had negotiated with the Governor. *Id.* at 1493–94. At the Secretary's urging, we dismissed that suit under Rule 19 as unable to proceed in Kansas's absence.

Just as we acknowledge that Hungary has an interest here, in *Kickapoo* we started from the premise that "the State of Kansas has an interest in the validity of a compact to which it is a party, and this interest would be directly affected by the relief that the Tribe seeks." *Id.* at 1495. The problem in *Kickapoo* was that the district court "assumed" that in Kansas's absence the Governor, who remained a party, "ha[d] the best interests of the State in mind," so adequately represented Kansas' interests. *Id.* at 1497. The reality was that the Governor had legally defined interests that diverged from the State's. Indeed, the Kansas Supreme Court had squarely ruled that, although the Governor could negotiate with the Kickapoo Tribe, he lacked authority to finalize binding compacts on Kansas's behalf. *Id.* at 1494, 1499. We accordingly held that the district court's Rule 19(b) analysis, based as it was on "assuming that the Governor could adequately represent the

interests of the State in entering the compact[,] was contrary to the controlling state law." *Id.* at 1498. The mistaken assumption that required reversal in *Kickapoo* is absent here, where Hungarian law confirms that the interests of the government and the remaining defendants are indeed closely aligned.

Finally, Defendants argue that the suit must be dismissed because damages awarded against them would as a practical matter ultimately be paid by Hungary. Even if that prediction is correct, Defendants' theory runs aground on two shoals.

First, Defendants are not themselves entitled to sovereign immunity. As discussed above, they fulfill commercial functions. *Cf. Transaero*, 30 F.3d at 153 (explaining that entities with commercial core functions are considered agencies or instrumentalities rather than foreign states themselves); *Roeder*, 333 F.3d at 234 (same). Hungarian law treats them as legal entities separate from the Hungarian government, able to sue and be sued on the same terms as private entities. Somody Decl. at 2, J.A. 3231. As the district court observed, MNV is "not so integral to Hungary's political structure that it should be considered Hungary's political subdivision." *Remand II*, 2020 WL 2343405, at \*16 (internal quotation marks omitted), J.A. 4071. Rather, all of the remaining defendants, as agencies or instrumentalities of Hungary, have more limited immunity than the sovereign state itself.

Second, and relatedly, Defendants' effort to assimilate themselves to Hungary based on their assertion that the government pays their bills contravenes the FSIA. As described above, the expropriation exception has two clauses, separately identifying the circumstances under which a foreign sovereign may be sued and those that would allow suit against

a foreign sovereign's agencies or instrumentalities. 28 U.S.C. 1605(a)(3). The district court explained how that statutory distinction matters here: "If an agency or instrumentality with some budgetary ties to the sovereign could never be sued unless the sovereign itself were also a party, it would be pointless for the FSIA to treat immunity for agencies and instrumentalities differently than for foreign states." *Remand II*, 2020 WL 2343405, at \*17. A "typical government instrumentality" sued under the second clause may, for example, require "appropriations to provide capital or to cover losses," *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 624 (1983); *see also, e.g.*, *Smith*, 279 F. Supp. 3d at 296–98; *Agudas*, 729 F. Supp. 2d at 146–48, but that prospect does not serve to collapse the distinction the statute reflects.

Contrary to Defendants' assertions, *see* Appellants' Br. 51, the Supreme Court's decision in *Mine Safety Appliances Co. v. Forrestal*, 326 U.S. 371 (1945), respects that distinction. The defendant Secretary of the Navy in that case was the head of a political subdivision of the government — not an agency or instrumentality — so the Court considered a suit against him for payments withheld from the plaintiff, a repeat government contractor, as effectively a suit against the sovereign. The Secretary withheld the disputed payments to recoup unlawfully excessive profits the contractor-plaintiff had received on prior contracts. The plaintiff challenged that withholding as "a tort by the Secretary, acting as an individual and not as an officer of the government, consisting of a trespass against [the plaintiff's] property." *Id.* at 373. The Court recognized that a trespass suit against a government official in his individual capacity might not be barred, but that no such case was before it. Rather, the "sole purpose" of the claim against Secretary Forrestal was to force payment "of money lawfully in the

United States Treasury to satisfy the government's and not the Secretary's debt." *Id.*

This case, by contrast, presents the very category of suit that *Mine Safety* would permit. For the reasons explained above, each of the defendants is an agency or instrumentality, not entitled as was the Secretary of the Navy in *Mine Safety* to partake of the sovereign's immunity. And here, unlike in *Mine Safety*, the allegations that MNV, the museums, and the university are unlawfully withholding the family's artworks do in fact "make out a threatened trespass against [the family's] property" by MNV, the museums, and the university. *Id.* at 374.

In sum, Hungary's absence from this litigation does not give rise to Rule 19(b) prejudice. Hungary is not likely to suffer because its interests are in complete alignment with those of the remaining defendants. Hungary's sovereign interests must be "accord[ed] proper weight." *Pimentel*, 553 U.S. at 869. But in this case, those interests are not placed at risk due to Hungary's absence. We therefore conclude that this first Rule 19(b) factor cuts in favor of allowing the suit to proceed.

The other Rule 19(b) factors similarly weigh in favor of the suit proceeding. The second factor directs courts to consider ways in which relief might be fashioned to reduce any potential prejudice to the absent or remaining parties. FED. R. CIV. P. 19(b)(2). As the Supreme Court recognized in *Pimentel*, "alternative forms of relief, including the granting of money damages rather than specific performance [and] the use of declaratory judgment," may mitigate prejudice to absent parties, including sovereigns. 553 U.S. at 870. Such mitigation is available here. The district court observed that "limiting plaintiffs' remedies to damages" as necessary could "further reduce[] any prejudice or risk of inconsistent obligations."

*Remand II*, 2020 WL 2343405, at \*15. We do not prematurely pass on the necessity of any remedial limitation, but merely note that Defendants give no reason to doubt the district court's remedial flexibility.

On the third factor, we conclude that the court could enter "adequate" relief in Hungary's absence. FED. R. CIV. P. 19(b)(3). Here, adequacy refers not "to satisfaction of [the family's] claims," but "to the 'public stake in settling disputes by wholes, whenever possible.'" *Pimentel*, 553 U.S. at 870 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968)). As explained above, various stages of this litigation have focused on distinct jurisdictional questions relating to the various artworks, but the suit as a whole seeks full resolution of the family's claims to the relevant artworks. Proceeding with the suit thus promotes "'the efficient administration of justice and the avoidance of multiple litigation'" in United States courts. *Pimentel*, 553 U.S. at 870 (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 738 (1977)).

Lastly, we consider whether the family would have any opportunity to receive the relief it seeks if this suit were dismissed. FED. R. CIV. P. 19(b)(4). If it could not pursue its claims in a United States court, the family would be remitted to the administrative and judicial processes available in Hungary. We agree with the district court that those efforts likely "would be futile." *Remand II*, 2020 WL 2343405, at \*15. Administrative compensation was not available in Hungary when the family brought this suit, and the Hungarian court that adjudicated the claims of another family member, Martha Nierenberg, "determined that returning the paintings to Nierenberg was made impossible by customs laws protecting cultural patrimony." *de Csepel v. Republic of Hungary*, 169 F. Supp. 3d 143, 170 n.15 (D.D.C. 2016).

We therefore affirm the district court's denial of the Rule 12(b)(7) motion to dismiss for failure to join a necessary party.

## IV.

Defendants further seek our review of the district court's denial of the Rule 12(b)(6) motion to dismiss for failure to exhaust potential remedies in Hungary, arguing that principles of international comity require prudential exhaustion. In *Simon* and *Philipp*, we held that cases against foreign states under the FSIA are not subject to a prudential exhaustion requirement. *Simon v. Republic of Hungary*, 911 F.3d 1172, 1180–82 (D.C. Cir. 2018); *Philipp v. Federal Republic of Germany*, 894 F.3d 406, 416 (D.C. Cir. 2018). The district court thus correctly determined that, at the time of its decision, "[b]inding Circuit precedent foreclose[d] defendants' argument that prudential exhaustion bar[red] plaintiffs' claims." *Remand II*, 2020 WL 2343405, at *33 (first citing *Simon*, 911 F.3d at 1181; and then citing *Philipp*, 894 F.3d at 415). The Supreme Court has since vacated both of those decisions on other grounds. *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021); *Republic of Hungary v. Simon*, 141 S. Ct. 691 (2021) (per curiam). As a formal matter, that vacatur reopens the issue in this circuit. Because requiring exhaustion would result in the dismissal of the suit, we deem it appropriate to address this issue now. *See* 28 U.S.C. § 1292(b).

We reaffirm our holdings and rationales in *Simon* and *Philipp* that the FSIA does not require prudential exhaustion in suits against foreign states. The FSIA "replac[ed] the old executive-driven, factor-intensive, loosely common-law-based immunity regime" with a "'comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.'" *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141 (2014) (quoting *Verlinden*

*B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983)). "Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *Id.* at 141–42. In particular, "[w]hen Congress wanted to require the pursuit of foreign remedies as a predicate to FSIA jurisdiction, it said so explicitly." *Simon*, 911 F.3d at 1181; *accord Philipp*, 894 F.3d at 415. The terrorism exception, for example, requires a claimant to first "afford[] the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(iii); *see also id.* § 1350 note § 2(b) (Under the Torture Victim Protection Act, "[a] court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."). The FSIA expropriation exception contains no such exhaustion requirement. *See id.* § 1605(a)(3). It is not our place to add one. We therefore affirm the district court's denial of the motion to dismiss based on prudential exhaustion.

## V.

Both the Defendants and the family also ask us to review now the district court's determinations asserting or declining jurisdiction over specific artworks. We need not review those fact-bound determinations on this interlocutory appeal. None "involves a controlling question of law as to which there is substantial ground for difference of opinion" such that immediate appellate review will "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

## VI.

For the foregoing reasons, we grant the petition for permission to appeal as to the district court's determinations that the suit may proceed under Rule 19, that the family may

amend its complaint to add MNV as a defendant, and that prudential exhaustion is not required; we deny the petition and conditional cross-petition for permission to appeal as to the district court's determinations of jurisdiction over individual artworks.  We affirm the district court on each of the issues appealed.

*So ordered.*